# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. NICKALOS BOYCE

**Appeal from the Criminal Court for Shelby County**
**No. 10-05539      Paula L. Skahan, Judge**

---

**No. W2011-01542-CCA-R3-CD  - Filed September 27, 2012**

---

The Defendant, Nickalos Boyce, was convicted by a Shelby County Criminal Court jury of aggravated robbery, a Class B felony, and sentenced as a Range I, standard offender to eight years in the Tennessee Department of Correction. On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Stephen C. Bush, District Public Defender, and Barry W. Kuhn (on appeal), Jennifer Johnson (at trial), and Alicia Kutch (at trial), Assistant Public Defenders, for the appellant, Nickalos Boyce.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Douglas Carriker and Brooks Irvine, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the robbery at gunpoint of Courtney Nicole Sanderson in the early morning hours of March 30, 2010, outside her apartment. At the trial, the victim testified that she lived on Mynders Avenue in Memphis on March 30, 2010. She explained that she had been out with friends on the night of the 29th and that they dropped her off at her apartment early the following morning. As she prepared to enter her home, two African-American men robbed her at gunpoint. When she first saw the two men, she thought they were residents of the apartment complex, but one of them grabbed her jacket and threw her against the wall. The man told her to face the wall and give him everything she had. Both

men had automatic pistols – one was silver in color and the other copper. They pointed their guns at her and held them against her body. She was unable to see the robbers' faces because everything happened quickly.

The victim testified that once the robbers had her against the wall, they began taking things from her. She recalled that they reached into her coat pockets and inside her shirt and pants pockets. They took a pair of red Panasonic headphones, an iPod, loose change, her identification, and a pink and silver cell phone. After the men robbed her, they ordered her to lie on the ground and not to get up, and they ran to their car. Once the men were gone, the victim called the police and reported the robbery. At the trial, she identified photographs of her stolen iPod, headphones, and cell phone.

Memphis Police Officer David Godsey testified that he was dispatched to 5890 Sun Cove, at the Edgewater Apartments, around 3:00 a.m. on March 30, 2010, in response to a call concerning a prowler. The dispatcher advised that an anonymous caller reported that a white male and a black male were breaking into a vehicle within the complex. The suspects were reported to be driving a green Chevrolet Blazer with a certain Tennessee license plate number. Officer Godsey located the vehicle, looked inside, and observed three black males lying down in the seats. He detained the men and called for backup.

Officer Godsey testified that several officers arrived to assist him. In searching the vehicle, the officers found an iPod, a set of headphones, GPS systems, radar detectors, cell phones, car chargers, and underneath a jacket, a loaded .380 caliber pistol. Officer Godsey did not see the Defendant. Photographs were taken of the property found inside the vehicle. In addition to the personal property found in the vehicle, the officers found hammers, a screwdriver, and other tools that were used to commit several burglaries.

Memphis Police Officer Michael Huff testified that he assisted Officer Godsey at the scene at the Edgewater Apartments. Inside the suspect vehicle, they found a pistol, several stolen items, and burglary tools. Officer Huff also found a wallet containing the Defendant's driver's license, his debit card, other documents bearing his name, and several receipts for guns the Defendant had pawned. Memphis Police Sergeant Christopher Vaden testified that the victim identified her stolen property.

Memphis Police Sergeant Matthew Pugh testified that the Defendant was arrested on April 5, 2010, and that the Defendant gave a statement after waiving his Miranda rights. When asked whether he was involved in the robbery of the victim, the Defendant responded that he was with Waymon "Trey" Manuel, Corey Dendy, and Anthony Dumas and that "they said they were going to get some weed and they got out of the car and came running back to the car . . . with a phone and [Dendy] had a gun in his hand. And they said they had

-2-

robbed that b----." Sergeant Pugh stated that the Defendant first saw a gun when Mr. Dendy ran back to the car after the robbery. The Defendant described the victim of the robbery as "short with black hair" and possibly Mexican.

Sergeant Pugh testified that the Defendant stated that a green Chevrolet Blazer was used during the robbery. When asked what the victim was doing at the time of the robbery, the Defendant stated that the victim was standing in front of the apartment doing nothing when he drove by. Sergeant Pugh read from the Defendant's statement:

> I was walking down Winchester. Corey [Dendy], Anthony [Dumas], and Trey [Manuel] were in Checkers and they were in Corey's car. They flagged me down and I got in and got a milkshake. When I asked them if they would give me a ride to my baby's momma's house, would they [drop] me off on Emerald and they went and gave my sister her food. They came back and picked me up and that's when they asked me if I wanted to do some licks and I said I guess so. So we started driving over to the college area because that's where Corey said all the money was, at the college, because them kids keep all kinds of s--- in their cars. We drove around the college area for about thirty minutes or so and we found his truck. I think it was a Dodge Ram, so Corey handed me the hammer. Anthony had spotted a GPS in the truck. I got out and broke the window out with the hammer and got the GPS. We rolled through the neighborhood and passed the college this time. We saw a woman outside and they told me to do a U-turn. [Trey] did a U-turn and they told me to park over around the corner. So we pulled around the corner and Anthony and Corey said they was going to go and get some weed or something. They came running back to the car and Corey had a gun and a phone in his hand. He threw the phone in the front seat and said, go, go, go. So, Trey went and drove to the gas station and I gave them eight dollars for gas. We turned down Central over near the college. I stopped and parked -- I stopped on a parking lot because Corey had seen a yellow Mustang that he liked. I didn't park by the Mustang but down near the exit of the lot. Corey got out of the car and walked off. He was gone for a couple of minutes, and then I saw the Mustang was peeling out. I thought Corey had stolen the Mustang so I pulled out, too, then they started yelling for me . . . to stop because Corey was running up. And

he jumped into the car and said, man, I just tried to rob that woman. When his car started messing up, like, it was running out of gas or something, so I pulled over and me and Trey got out and told them that . . . I didn't want anything to do with robbing anyone else at gunpoint again. We got back in the car and I got . . . in the backseat. We drove around to Stonebridge or Stonebrook Apartments. They let me out and I looked around but couldn't . . . find anything in the cars. On the way out, Anthony had seen a car with some luggage in the back, so Anthony jumped out and broke the window out with the hammer and we got that luggage. Then we went and got off on Sycamore View. We cruised around there until we seen a dirt bike. We all tried to get the dirt bike in the truck but it wouldn't fit, so we just left it. We drove over to the Edgewater [Apartments] and I broke into a SUV and got a GPS out of that car. That was the last one. We drove into the apartment complex and I got out on foot and was looking for something else when the police pulled up and caught them in the car.

Sergeant Pugh said the Defendant recounted that the items taken from the victim during the robbery were a pink cell phone and a red headset. When asked if the victim was injured during the robbery, the Defendant said that he did not know but that the others said they did not hurt her. When questioned about what they planned to do with the items stolen that night, the Defendant said they were going to sell the items to "a guy" Dendy knew and split the proceeds. The Defendant said he left his wallet containing his personal identification items in the Chevrolet Blazer that night.

Sergeant Pugh testified that he did not know what doing some "licks" meant but that the Defendant described it to him as "going out and basically finding things to steal or to rob, anything you come upon that you can make some easy money." Sergeant Pugh recalled that the Defendant tried to minimize his involvement. He said the Defendant made inconsistent statements regarding whether he was driving or was in the backseat. When he questioned the Defendant about the inconsistencies, "[A] lot of times he would say I turned the car around or I pulled over and parked which indicated . . . he was actually driving the vehicle at the time."

The Defendant testified that he was with Waymon "Trey" Manuel, Corey Dendy, and Anthony Dumas on the night of March 30, 2010. While they were driving, Dendy told the Defendant that "they were going to go do some licks," which the Defendant said meant that they were going to break into cars and steal items so they could "sell them and get some

-4-

money." They did not talk about robbing anyone. The Defendant agreed to go along with them. He recalled that they already had hammers and a screwdriver in the car with them and that he was in the backseat at the time. The Defendant testified that they were driving around the area near the college when Dumas spotted a truck with a GPS system on the front windshield. He said that Dendy handed him a hammer and that he broke the window of the truck and stole the GPS system.

The Defendant testified that they continued to drive around the college area looking for more cars to burgarize and that he drove after Dendy tired of driving. They decided they wanted to buy marijuana, and the Defendant drove to an apartment complex at Dendy's direction. Dendy and Dumas got out of the car and told the Defendant to find a place to park. The Defendant left the parking lot and parked around the corner. Five to seven minutes later, Dendy and Dumas ran to the car saying, "[G]o, go, go." Dendy threw a pink and silver cell phone onto the front seat, and the Defendant looked back and saw that Dendy had a gun in his hand. They went to a gas station where the Defendant gave Dendy eight dollars for gas.

The Defendant testified that after they left the gas station, they drove a few blocks and pulled into a dark parking lot where Dendy saw a yellow Mustang he wanted to burglarize. After a couple of minutes, the Defendant saw the Mustang "peel out" of the parking lot, and thinking Dendy had stolen the car, he left. As he was driving away, Dumas and Manuel told him to stop because Dendy was running toward them. Dendy got into the car and told them that he had just tried to rob a woman. The Defendant said he got out of the car and told Dendy that he wanted nothing to do with robbery. Dendy assured the Defendant that it was not his fault. The Defendant got back into the car but would not drive anymore.

The Defendant testified that they drove to Stonebridge or Stonebrook Apartments because Dendy said they needed two more GPS systems because the man to whom they were going to sell them "only buys them in three." The Defendant got out of the car and searched unsuccessfully for a car with a GPS system. As they were leaving, Dumas saw a purple suitcase in one of the cars and broke into the car with a hammer. They drove to another apartment complex to search for GPS systems but saw a mini dirt bike and decided to steal it. They were unable, however, to fit the bike into the car. They drove to another apartment complex, where the Defendant saw an SUV with a GPS system attached to the front window. He broke into the SUV and took the GPS system and other items.

The Defendant testified that Dendy said they needed one more GPS system and drove further into the apartment complex. The Defendant got out and tried to find a vehicle with a GPS system. As he searched, he saw a police officer drive down the hill, stop, and block

Dendy's vehicle. The Defendant testified that he fled and walked to his children's mother's house.

The Defendant testified that contrary to how it sounded in his statement, he did not learn until the next day that Dendy and Dumas had robbed the victim and that they had taken a phone and headset from her. The Defendant said that his intention on the night of the robbery was to get a ride to his children's mother's house but that he and his companions decided to break into cars. He said he did not know a robbery was going to take place and did not intend to participate in it. The Defendant stated that even though he participated in the burglaries, they never discussed whether he would receive any of the proceeds. The Defendant pointed to several things in his written statement that he said were incorrectly included or omitted by Sergeant Pugh.

Upon this evidence, the jury found the Defendant guilty of aggravated robbery. This appeal followed.

The Defendant contends that the evidence is insufficient to sustain his conviction. He argues that no evidence proves he participated in the robbery. The State contends that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The jury decides the weight to be given to circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d

370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Pertinent to this case, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401, -402(a)(1) (2010). A defendant is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2) (2010). To be criminally responsible for the acts of another, a defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). In other words, the defendant must "'knowingly, voluntarily and with common intent unite with the principal . . . in the commission of the crime.'" Maxey, 898 S.W.2d at 757 (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). The requisite criminal intent may be inferred from the defendant's "presence, companionship, and conduct before and after the offense . . . ." State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982).

Taken in the light most favorable to the State, the evidence shows that the Defendant and three of his associates went out to "do some licks," which is "going out and basically finding things to steal or to rob, anything you come upon that you can make some easy money," on the night of March 29 and early morning of March 30, 2010. During the course of their committing numerous auto burglaries, the victim was robbed of her cell phone, iPod, and headphones by two of the Defendant's associates. Even if the Defendant was not the one who robbed the victim, he drove the car, parked around the corner and waited, and then drove them from the scene at the behest of one of his associates, who said, "[G]o, go, go," and that they had "robbed that b----." Also, when Mr. Dumas and Mr. Dendy returned to the car, the Defendant admittedly noticed that one of them had a gun and a pink and silver cell phone. However, the Defendant continued to commit burglaries with his associates for the remainder of the evening. The Defendant's testimony that he had no knowledge of the robbery and that certain things in his statement were not what he told Sergeant Pugh was heard and assessed by the jury, which obviously found such testimony not credible. Thus, as a result of the Defendant's participation and presence before, during, and after the robbery, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant "'knowingly, voluntarily and with common intent[,] unite[d] with

-7-

the principal[s] . . . in the commission of the [aggravated robbery].'"  See Maxey, 898 S.W.2d at 757 (quoting Foster, 755 S.W.2d at 848).  We conclude that the evidence is sufficient to support the Defendant's conviction.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE
